554 S.E.2d 121

**STATE of West Virginia ex rel. JEANNE U., Petitioner,**

v.

**Honorable Herman G. CANADY, Jr., Judge of the Circuit Court of Kanawha County, and Stephen C. M., Respondents**

No. 29706.

Supreme Court of Appeals of West Virginia.

Submitted Sept. 5, 2001.

Decided Oct. 5, 2001.

---

Jeanne U., Pro Se.

Parrish McKittrick, Germantown, Maryland, Attorney for the Respondent, Stephen C. M.

Herbert L. Hively, II, Hurricane, West Virginia, Attorney for David U.

Beverly S. Selby, Charleston, West Virginia, Guardian Ad Litem for Jordan David U.

ALBRIGHT, Justice:

Jeanne U.[1] (hereinafter "Appellant") seeks a writ of prohibition against The Honorable Herman Canady of the Circuit Court of Kanawha County to prevent the enforcement of an August 22, 2000, order directing that the Appellant's twelve-year-old son, Jordan, be told that Stephen M. is his biological father and ordering that Stephen M. be permitted to have visitation with Jordan thereafter. The Appellant contends that the determinations of the lower court should not be enforced because she was deprived of an opportunity to testify regarding what she perceived to be the best interests of her son. Having reviewed the arguments of counsel and briefs in this case, this Court grants the writ, as moulded.

---

**1.** Consistent with our general practice, we use initials rather than full names in cases involving sensitive matters. *See In re Jonathan P.*, 182 W.Va. 302, 303 n. 1, 387 S.E.2d 537, 538 n. 1 (1989).

## I. Facts

While married to David U. in 1988, the Appellant maintained an intimate relationship with Stephen M. and became pregnant. The Appellant's husband, David U., with knowledge that he was not the biological father, informed the Appellant that he would raise the child as his own.

Stephen M. contends that the Appellant informed him of the pregnancy and that he offered his full financial support to the Appellant on March 23, 1989, prior to the birth of the child. In April 1989, Stephen M. and his wife contacted an attorney for the purpose of pursuing proceedings to declare Stephen M. the biological father and securing visitation. The attorney allegedly referred Stephen M. to another attorney, and Stephen M. was ultimately advised that he had no legal standing to pursue an action for paternity since the Appellant was married to another man.

Jordan U. was born on May 27, 1989. On May 28, 1989, Stephen M. and his wife visited Jordan in the hospital, upon the Appellant's invitation. Stephen M. sent a letter and some baby clothing to David U. on May 30, 1989, and advised David U. that Stephen M. wished to be declared Jordan's natural father and to support the child.

While the parties' recollection of the progression of visitation between Stephen M. and Jordan differs, Stephen M. testified that he visited with Jordan on numerous occasions from Jordan's birth until late 1990.[2] Visitation resumed in early 1992 subsequent to the Appellant's divorce from her husband, David U. Stephen M. paid the Appellant approximately $100.00 per week from February 1992 through March 1993.[3] The Appellant began refusing support payments in March 1993, and there has been no visitation between Jordan and Stephen M. from 1993 to the present.

The Appellant apparently stopped allowing visitation when Stephen M. requested a family law master hearing in March 1993 to determine whether blood tests could be performed to prove that he was Jordan's biological father. Stephen M. continued, unsuccessfully, to pursue litigation from 1993 to 1997.[4]

In early 1997, Stephen M. filed a declaratory judgment action in the lower court, seeking to be adjudicated as Jordan's biological father and to establish visitation and support provisions. On November 6, 1997, Judge Canady appointed attorney Beverly Selby as guardian ad litem for Jordan. On May 21, 1998, a stipulation was entered in which the Appellant, David U., and Stephen M. stipulated that Stephen M. was the biological father of Jordan.

Ms. Selby filed a guardian ad litem report on May 26, 1998, indicating that although there were differences in recollection between Jeanne U. and Stephen M. regarding the number and length of visitations, several visits had occurred and a substantial relationship between Stephen M. and Jordan had been established. On May 28, 1998, Judge Canady held a hearing at which Stephen M. was permitted to testify regarding his substantial relationship with Jordan prior to the cessation of visitation when Jordan was three years old. Judge Canady denied the Appellant's request to testify regarding her recollection of the visitation progression or her

---

2. Specific examples of such visitation, according to Stephen M.'s testimony, include a November 1989 visit at a restaurant, a March 1990 visit at the home of Stephen M.'s mother, a May 1990 visit, a September 1990 visit at Stephen M.'s home, and an October visit at Stephen M.'s home in which the Appellant left Jordan with Stephen M. and his wife for some period of time. The Appellant also sent Stephen M. a Father's Day card signed from Jordan in 1990 and sent Stephen M. pictures of Jordan in August 1990. The Appellant allegedly requested that Stephen M. cease visitation with Jordan in late 1990 to facilitate the Appellant's attempts to concentrate on difficulties within her marriage.

3. The Appellant characterizes these payments as assistance; Stephen M. characterizes them as support payments. The visitation from February 1992 through March 1993 included visits at Stephen M.'s home, local restaurants, a trip on an Amtrak train to the Greenbrier Resort in White Sulphur Springs, West Virginia, a trip to Stephen M.'s family reunion, a trip to a wave pool, a trip to Camden Park in Huntington, West Virginia, a trip to a class reunion, a church picnic, a parade, Cass Scenic Railroad, and Snowshoe Ski Resort.

4. From 1993 to 1997, Stephen M.'s attorney, subsequently disbarred, failed to diligently pursue Stephen M.'s case.

contemplation regarding the best interests of her son.

On June 18, 1998, Judge Canady entered an order explaining that although the Appellant requested the opportunity to testify at the May 28, 1998, hearing, Judge Canady denied the request because he found it "was unnecessary considering the unimpeachable Exhibits in the form of many, many pictures and the testimony of the Petitioner concerning his pattern of visitation with his son." The June 18, 1998, order further provided that Dr. Jeffrey Harlow, child psychologist, would be appointed to conduct an investigation of whether disclosure to Jordan would be harmful and to facilitate a visitation schedule between Stephen M. and Jordan. The order also provided that the parties had stipulated that they would be bound by the recommendations of Dr. Harlow.

On March 24, 2000, Dr. Harlow submitted a report finding that Jordan should be told that Stephen M. is his biological father and recommending visitation between Jordan and Stephen M. Dr. Harlow also found that visitation should be facilitated through a psychologist, and recommended Marilyn Cassis to serve in that capacity. Dr. Harlow also recommended that Jordan continue visitation with his legal father, David U., and that Jordan continue to reside the majority of time with his mother.

On August 22, 2000, the lower court entered an order incorporating the recommendations of Dr. Harlow by reference and finding that those recommendations were in the best interest of Jordan. The order held that Jordan should be told that Stephen M. is his father, in accordance with the recommendations of Dr. Harlow and Ms. Selby, and that the visitation recommendations contained in Dr. Harlow's report should be initiated.

Judge Canady appointed Marilyn Cassis on October 26, 2000, as a visitation coordinator to assist with the visitation between Jordan and Stephen M. On April 2, 2001, Ms. Cassis informed Ms. Selby that the Appellant continued to refuse to inform Jordan that Stephen M. was his natural father.

On May 18, 2001, the Appellant filed this Petition for a Writ of Prohibition, pro se,[5] to prevent enforcement of the August 22, 2000, order, alleging she was improperly deprived of an opportunity to be heard on the issue of the best interests of her son. Subsequent to the filing in this Court, the Appellant informed Jordan that Stephen M. was his biological father. The Appellant explained in oral argument to this Court that although she informed her son that Stephen M. was his biological father, she still maintains that it is not in Jordan's best interest to initiate the visitation envisioned in Dr. Harlow's report.

## II. Standard of Review on Writ of Prohibition

Syllabus point four of *State ex rel. Hoover v. Berger,* 199 W.Va. 12, 483 S.E.2d 12 (1996) provides as follows:

In determining whether to entertain and issue the writ of prohibition for cases not involving an absence of jurisdiction but only where it is claimed that the lower tribunal exceeded its legitimate powers, this Court will examine five factors: (1) whether the party seeking the writ has no other adequate means, such as direct appeal, to obtain the desired relief; (2) whether the petitioner will be damaged or prejudiced in a way that is not correctable on appeal; (3) whether the lower tribunal's order is clearly erroneous as a matter of law; (4) whether the lower tribunal's order is an oft repeated error or manifests persistent disregard for either procedural or substantive law; and (5) whether the lower tribunal's order raises new and important problems or issues of law of first impression. These factors are general guidelines that serve as a useful starting point for determining whether a discretionary writ of prohibition should issue. Although all five factors need not be satisfied, it is clear that the third factor, the existence of clear error as a matter of law, should be given substantial weight.

## III. Discussion

In *State ex rel. Roy Allen S. v. Stone,* 196 W.Va. 624, 474 S.E.2d 554 (1996),

---

**5.** Attorney Charles Webb withdrew as counsel for the Appellant on April 4, 2001.

this Court had the opportunity to extensively address the legal requirements for standing of a putative biological father to raise the issue of paternity of a child born to a married woman, not his wife. In enumerating the such standards, this Court explained as follows in syllabus point six of *Roy Allen S.*:

A putative biological father must prove by clear and convincing evidence the following factors before he will have standing to raise the issue of paternity of a child born to a married woman who is not his wife: (1) that he has developed a parent-child relationship[6] with the child in question, and (2) that the child will not be harmed by allowing the paternity action to proceed.

In syllabus point three of *Roy Allen S.*, this Court explained its reasoning for application of those two prerequisites to standing:

In the absence of special circumstances which would justify an exception, a petition by a putative biological father seeking to establish his paternity over a child who was born while the mother was married to another man may not proceed unless the putative father clearly and convincingly proves as a threshold matter that he has established a substantial paternal relationship with the child. *The putative father's showing need not be made, however, if no person or party (named or intervening and including the guardian ad litem) contests the petition.*

196 W.Va. at 626, 474 S.E.2d at 556 (emphasis supplied). Syllabus point seven of *Roy Allen S.* further provides:

When a putative biological father raises a paternity claim, the child must be joined and a guardian *ad litem* appointed. The circuit court should conduct a preliminary hearing to determine whether the requisite preconditions are present. In addition, the preeminent factor in deciding whether to grant or deny blood testing is the child's best interests. The analysis of each factual situation is necessarily a discretionary decision for the circuit court, and the finding by the circuit court will not be reversed absent an abuse of discretion.

*Id.*

■ *Roy Allen S.* also explains that a finding, or in this case a stipulation, of paternity does not end the inquiry. "Even if he proves paternity, he still is not necessarily entitled to intrude further into the marital family (if it has survived) or into existing child-parent relationships, including any relationship that has developed between the presumed father and the child ..." 196 W.Va. at 636, 474 S.E.2d at 566. "A finding of paternity would only entitle the natural father to an opportunity to request to invoke his parental rights; in response, it would remain for the circuit court to determine issues of visitation, custody, etc., based on the best interests of the child." *Id.*

The crucial distinction between *Roy Allen S.* and the case *sub judice* is that the situation in *Roy Allen S.* did not include a stipulation that the individual was the child's biological father. The standing requirements of *Roy Allen S.* apply where a putative biological father seeks *standing to raise the issue* of paternity; a hearing is thereafter necessary to determine standing to *pursue an action* to establish paternity. Conversely, in the present case, the issue was not *standing to pursue* an action to establish paternity. In this action, at the point at which the court permitted Stephen M. to prove a substantial relationship, the paternity issue had been resolved by the stipulation of the parties to the effect that Stephen M. was Jordan's biological father.

The lower court recognized this distinction between *Roy Allen S.* and this case, based upon the existence of the stipulation, and questioned whether a hearing was neces-

---

6. Syllabus point two of *Roy Allen S.* elucidates the Court's rationale for requiring that a substantial parent-child relationship exists:

Although an unwed father's biological link to his child does not, in and of itself, guarantee him a constitutional stake in his relationship with that child, such a link combined with a substantial parent-child relationship will do so.

When an unwed father demonstrates a full commitment to the responsibilities of parenthood by coming forward to participate in the rearing of his child, his interest in personal contact with his child acquires substantial protection under the Due Process Clause in Section 10 of Article III of the West Virginia Constitution.

sary.[7] Out of an "abundance of caution," the court chose to allow Stephen M. to testify to prove that he and Jordan had established a substantial relationship. The court denied the Appellant's request to testify at that hearing, and the Appellant was never subsequently granted an opportunity to testify regarding her perception of the best interests of her son. The Appellant's proffered testimony would have encompassed both the substantial relationship and best interest issues. We view the lower court's resulting order as transferring the determination of the best interests of the child to a psychologist, upon the parties stipulation, and proceeding toward a final best interests determination without the benefit of the Appellant's testimony.

### IV. Conclusion

■■■■■ Based upon our review of this matter, we conclude that the lower court was correct in determining that the substantial relationship hearing of May 28, 1998, was not legally required since there was a stipulation regarding paternity. The question of prior contact between the biological father and the child did not have to be addressed at that stage of the proceedings. The court's acceptance of Stephen M.'s testimony regarding the substantial relationship issue, despite the court's own acknowledgment that such hearing was not required, and the court's concurrent denial of the Appellant's opportunity to testify generated a procedural anomaly which has never been remedied.

■■■■■ In evaluating this matter, it appears that the "substantial relationship" inquiry serves a dual role in evaluating issues of paternity and appropriate visitation rights. It serves a gatekeeping role in determinations regarding a putative father's standing to raise the issue of paternity and must be proven as a prerequisite to permitting the action by the putative father, as explained in *Roy Allen S.* Additionally, the existence of such a relationship serves as an issue to be examined with regard to the best interests of the child. In such best interest analysis, the existence of a substantial relationship would be one of many factors to be evaluated, significant but not dispositive.

In attempting to fashion an appropriate remedy, this Court must endeavor to formulate redress to rectify the predicament as it currently exists, evaluating this situation within the following context: the lower court's acceptance of testimony on the issue of "substantial relationship" from Stephen M.; its concurrent refusal to permit the Appellant's testimony on the issue of the best interests of her son; the absence of any meaningful judicial evaluation and determination regarding the best interests of the child; and the changed circumstances occasioned by the Appellant's revelation to her son of the truth regarding his biological father.

■■■■■ This Court accordingly remands this matter to the learned trial court for an examination of the issue of visitation in light of Jordan's best interests. An evidentiary hearing should be conducted, and the testimony of the parties and all other pertinent witnesses should be taken regarding Jordan's best interests. The analysis of Jordan's best interests must necessarily include, among other issues deemed appropriate by the lower court, consideration of Jordan's concerns and preferences. While Jordan is not yet fourteen years of age, his age and maturity level should be considered, and his desires concerning visitation with his biological fa-

---

7. The lower court reasoned as follows in the June 18, 1998, order:

   [A]ssuming the Respondents in this matter objected to the Petitioner establishing paternity it would be incumbent upon the Petitioner to prove a substantial relationship with the child. However, in this case, the Respondents and the Guardian Ad Litem, by her report, do not now contest the paternity of the Petitioner, Stephen [M.] and, in fact, have signed an agreement and stipulation that Stephen [M.] is the biological father of Jordan [U.] Does this mean the

   biological father does not now have the burden to prove a substantial relationship with the infant child ... Well, it is the ruling of this court that it is not necessary for the Petitioner to now show a substantial relationship with the infant child since paternity has now been established by the lack of objection of the Respondents and in view of the agreement and stipulation that the biological father is, in fact, Stephen [M.] However, out of an abundance of caution this court required the Petitioner to present enough evidence to show such substantial relationship.

ther must be examined. While he was vigorously represented by a guardian ad litem, he was not personally involved in the underlying determinations and had not been informed that Mr. M. was his biological father during the pendency of this action below. We have before us his mother's representations as to his preferences. We believe, however, that based upon the drastically changed circumstances and Jordan's age, Jordan's personal opinions and his maturity to reach such conclusions should be evaluated on remand. Where paternity has been established and the best interests of a child regarding visitation with the biological father are being evaluated, the child's opinions and desires may be considered by the trial court, construed in light of the child's age, maturity level, and ability to make an independent judgment. Additionally, the court should afford the Appellant and other parties an opportunity to be heard in a complete evidentiary hearing on the best interests issue.

We share the trial court's view that the opinions of the parties, the guardian ad litem,[8] and psychological and other experts, if any, should be considered in deciding the visitation questions presented here. However, the trial court retains the ultimate power of disposition in this case, and the best interests determination must be rendered by the court exercising its independent judgment and the court's judicial power.[9] As this Court has so frequently emphasized, the best interests of the child is the polar star by which all matters affecting children must be guided. *See* Syl. Pt. 7, *In re Brian D.*, 194 W.Va. 623, 461 S.E.2d 129 (1995) ("Cases involving children must be decided not just in the context of competing sets of adults' rights, but also with a regard for the rights of the child(ren)."); *Michael K.T. v. Tina L.T.*, 182 W.Va. 399, 405, 387 S.E.2d 866, 872 (1989) ("[T]he best interests of the child is the polar star by which decisions must be made which affect children.").[10]

We recognize that the task of the trial court is particularly difficult where, as appears here, the deeply-felt emotions of the parties may cloud their judgment and perspective, leaving the court no happy or easy

---

8. While the guardian ad litem is appointed to protect the interests of the minor child, the ultimate determination regarding the best interests of the child remains a function of the trial court, as assisted by the recommendations of the guardian ad litem and others. The court retains the obligation to protect the interests of the child. Rule 21.01 of the West Virginia Rules for Trial Courts of Record provides that a

> guardian ad litem shall make a full and independent investigation of the facts involved in the proceeding; and either by his or her testimony made of record, or by full and complete answer therein, make known to the court his or her recommendations, concerning the action sought in the proceedings unless otherwise ordered or instructed by the court.

As this Court acknowledged in *In re Lindsey C.*, 196 W.Va. 395, 473 S.E.2d 110 (1995):

> Obviously, those recommendations may or may not be identical to those the child would make to the court, left entirely to his or her own choices. However, in the case of a child, justice is clearly best served by requiring that counsel and the court exercise their respective best judgment in all aspects of the case, and that the court have the benefit of counsel's candid and independent assistance in ascertaining the best interests of that child.

*Id.* at 409, 473 S.E.2d at 124. *See generally, In re Jeffrey R. L.*, 190 W.Va. 24, 435 S.E.2d 162 (1993); *In re Scottie D.*, 185 W.Va. 191, 406 S.E.2d 214 (1991).

9. As the Supreme Court of Montana succinctly stated in *In re Custody of J.M.D.*, 259 Mont. 468, 857 P.2d 708 (1993), "[t]he court is free to consider the parties' stipulation, however, ultimately the court must made an independent judgment regarding custody." In discussing the binding nature of parents' stipulations regarding custody of children in the context of a divorce, the Wisconsin Supreme Court explained: "A contract between parents . . . should be given serious consideration by the court as it normally expresses what may be best for the child; nevertheless it does not bind the court or preclude a modification of a decree based thereon." *King v. King*, 25 Wis.2d 550, 131 N.W.2d 357, 360 (1964). As the Wisconsin Court also expressed in *Racine Family Court Comm'r v. M.E.*, 165 Wis.2d 530, 478 N.W.2d 21 (1991), the paramount question is not what the parties might agree to, but rather what is in the child's best interests. *Id.* at 23–24. In the court's "role as a family court, the trial court represents the interests of society in promoting the stability and best interests of the family." *Kritzik v. Kritzik*, 21 Wis.2d 442, 124 N.W.2d 581, 585 (1963).

10. While many of this Court's prior opinions discussing the "polar star" involve child custody, abuse and neglect, or paternity determinations, the concept is equally applicable to matters in which visitation with children is being adjudicated.

choices. Nevertheless, we repose confidence in the trial judge to hear the evidence and determine the best course for this child. We invite all of the litigants to fully cooperate with the terms of the order ultimately made by the court below, for the benefit of Jordan and all concerned.

Based upon the foregoing, we grant the requested writ of prohibition, as moulded, and remand this matter to the lower court for further proceedings consistent with this opinion.

Writ granted as moulded.