IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

September 2024 Term

**FILED**
**November 14, 2024**
released at 3:00 p.m.
C. CASEY FORBES, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

No. 23-506

IN RE: M.M.

Appeal from the Circuit Court of Putnam County
The Honorable Joseph K. Reeder, Circuit Judge
Civil Action No. 21-JA-68

AFFIRMED

Submitted: October 23, 2024
Filed: November 14, 2024

Abraham J. Saad, Esq.
Glazer Saad Anderson, LLC
Counsel for Petitioners A.P.-1 and A.P.-2

Gregory M. Courtright, Esq.
Courtright Law Office, PLLC
Guardian ad Litem for the Minor Child,
M.M.

Rosalee Juba Plumley, Esq.
Law Office of Rosalee Juba Plumley
Counsel for Respondent E.L.

Patrick Morrisey, Esq.
Attorney General
Kristen Ross, Esq.
Assistant Attorney General
Office of the Attorney General
Charleston, West Virginia
Counsel for Respondent West Virginia
Department of Human Services

JUSTICE WALKER delivered the Opinion of the Court

CHIEF JUSTICE ARMSTEAD dissents and reserves the right to file a dissenting opinion.

SYLLABUS BY THE COURT

1. "'When this Court reviews challenges to the findings and conclusions of the circuit court, a two-prong deferential standard of review is applied. We review the final order and the ultimate disposition under an abuse of discretion standard, and we review the circuit court's underlying factual findings under a clearly erroneous standard.' Syl., *McCormick v. Allstate Ins. Co.*, 197 W. Va. 415, 475 S.E.2d 507 (1996)." Syllabus Point 1, *In re S.W.*, 236 W. Va. 309, 779 S.E.2d 577 (2015).

2. "'A finding is clearly erroneous when, although there is evidence to support the finding, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. However, a reviewing court may not overturn a finding simply because it would have decided the case differently, and it must affirm a finding if the circuit court's account of the evidence is plausible in light of the record viewed in its entirety.' Syl. Pt. 1, in part, *In the Interest of Tiffany Marie S.*, 196 W. Va. 223, 470 S.E.2d 177 (1996)." Syllabus Point 4, *Argus Energy, LLC v. Marenko*, 248 W. Va. 98, 887 S.E.2d 223 (2023).

3. "'Questions relating to custody of the children are within the sound discretion of the court [and] its action with respect to such matters will not be disturbed on appeal unless it clearly appears that such discretion has been abused.' Syl., in part, *Nichols v. Nichols*, 160 W. Va. 514, 236 S.E.2d 36 (1977)." Syllabus Point 2, *In re G.G.*, 249 W. Va. 496, 896 S.E.2d 662 (2023).

4. "'[I]n a contest involving the custody of an infant where there is no biological parent involved, the best interests of the child are the polar star by which the discretion of the court will be guided.' Syl. Pt. 1, in part, *State ex rel. Treadway v. McCoy*, 189 W. Va. 210, 429 S.E.2d 492 (1993)."  Syllabus Point 9, *In re G.G.*, 249 W. Va. 496, 896 S.E.2d 662 (2023).

5. "West Virginia Code § 49-2-126(a)(5) (2020) requires a circuit court to conduct a best-interest-of-the-child analysis before removing a foster child from his or her foster family home and placing that child in a kinship placement." Syllabus Point 4, *In re G.G.*, 249 W. Va. 496, 896 S.E.2d 662 (2023).

6. "'The best interests of a child are served by preserving important relationships in that child's life.' Syl. Pt. 2, *State ex rel. Treadway v. McCoy*, 189 W. Va. 210, 429 S.E.2d 492 (1993)."  Syllabus Point 7, *In re G.G.*, 249 W. Va. 496, 896 S.E.2d 662 (2023).

WALKER, Justice:

The child M.M. was removed from her mother's custody and eventually placed with Petitioner foster parents A.P.-1 and A.P.-2.[1] After mother passed away, Respondent E.L., the child's maternal aunt, intervened to seek custody. Following three permanency hearings, the circuit court concluded that it was in the child's best interest to be placed permanently with E.L. On appeal, A.P.-1 and A.P.-2 argue that the court erred in its best-interest-of-the-child analysis. But in its order, the circuit court made extensive findings of fact and conducted a meticulous analysis of the best interest of the child. We find no error in the circuit court's placement determination, so we affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The West Virginia Department of Human Services (DHS)[2] took emergency custody of the child M.M.[3] in August 2021, after the child's mother was arrested for

---

[1] In their briefs, the parties refer to the foster parents collectively as A.P. and A.P. For the sake of clarity, this opinion will refer to the foster mother as A.P.-1 and the foster father as A.P.-2.

[2] Under West Virginia Code § 5F-2-1a (eff. 2023), the agency formerly known as the West Virginia Department of Health and Human Resources was terminated. It is now three separate agencies—the Department of Health Facilities, the Department of Health, and the Department of Human Services. *See* W. Va. Code § 5F-1-2 (eff. 2024). For purposes of abuse and neglect appeals, the agency is now known as DHS.

[3] We use initials in cases involving sensitive facts to protect the identities of those involved. *See* W. Va. R. App. P. 40(e); *State v. Edward Charles L.*, 183 W. Va. 641, 398 S.E.2d 123 (1990).

1

possession of various substances. DHS then filed an abuse and neglect petition alleging that the mother's drug use negatively impacted her parenting abilities and that her parental rights to an older child had been involuntarily terminated. Shortly after DHS took temporary, emergency custody of M.M., the child's maternal grandmother, E.N., took physical custody of M.M. But after E.N. left the state with M.M. without obtaining authorization from DHS in September 2021, DHS removed M.M. from E.N.'s custody and placed the child with foster parents A.P.-1 and A.P.-2.[4]

In October 2021, the mother passed away due to complications from Covid-19. That same month E.L.—the child's maternal aunt and a California resident—contacted DHS to inquire about M.M.'s safety and well-being. DHS worker Steve Postle informed E.L. that he could not "give out a lot of the information" and that E.L. would need to file a motion to intervene before he could share information about the case. A short time later, E.L. moved to intervene, seeking the permanent placement of M.M.[5] DHS opposed the motion, alleging that E.L. had assisted E.N. in "kidnapping" M.M.[6] The circuit court

---

[4] DHS placed M.M. with A.P.-1 and A.P.-2 in spite of multiple prospective kinship placements that had informed DHS about their willingness to take M.M.

[5] According to E.L., she waited until December to intervene in order to allow a potential putative father to take a DNA test and determine whether he was related to M.M. Once the DNA results became available and showed that he was not the father, E.L. filed her motion to intervene.

[6] It is apparent from the record that the "kidnapping" alluded to by the DHS refers to the occasion that E.N. left the state with M.M. in September 2021. This allegation proved to be unsubstantiated.

ultimately granted E.L.'s motion to intervene and ordered DHS to submit the paperwork necessary to complete the Interstate Compact on the Placement of Children (ICPC) home study process considering E.L.'s California residency.[7]  In August 2022—roughly eight months after the circuit court ordered DHS to commence the ICPC process—the California Department of Social Services determined that E.L.'s home was an appropriate placement for M.M.

In October 2022, E.L. moved from California to West Virginia to be closer to M.M. and was allowed visits with the child twice weekly, three hours each.[8]  At a visitation hearing the following month, the court granted E.L. additional, weekly visits with M.M.  Also in October 2022, A.P.-1 and A.P.-2 successfully moved to intervene in these proceedings.

The circuit court held three permanency hearings in December 2022, January 2023, and May 2023.  DHS called Steve Postle—M.M.'s case manager—as a witness at

---

[7] E.L. resides in California.  Because she resides in a state other than West Virginia, the Interstate Compact on the Placement of Children's uniform guidelines govern the placement process.  The legislature adopted the ICPC within Chapter 49 Section 7 of the West Virginia Code.  Under W. Va. Code § 49-7-102(b), the DHS is empowered to cooperate with appropriate officers from another state's agencies in order to determine the placement of children.

[8] Transcripts from previous hearings are not available in the record before this Court, but according to the circuit court's October 31, 2022, order, the court granted E.L.'s motion for visitation after a hearing that occurred on October 6, 2022.  E.L. had first been granted a visit with M.M. in February 2022.

the December hearing.[9]  Mr. Postle expressed DHS's recommendation that M.M. remain with A.P.-1 and A.P.-2, but then conceded that he based much of his placement recommendation on his observations of M.M.'s bond with A.P.-1 and A.P.-2, that he had not observed visits between M.M. and E.L., and that he could not speak to M.M.'s bond with E.L.  Mr. Postle also acknowledged that he refused to give E.L. specific details about the proceedings following the death of the mother, and that although DHS is required to identify prospective relative and kinship placements, DHS failed to "put this child up with a relative" after M.M. was removed from her placement with E.N.[10]

Following Mr. Postle's testimony, the court heard from Karley Rose, a paraprofessional with Children First.  Ms. Rose informed the court that M.M. responded positively to E.L. during visitation—a fact similarly attested to by M.M.'s Court Appointed Special Advocate (CASA), Clarissa Mills-Pyles.  Ms. Pyles specifically testified that M.M. and E.L. "seemed to have a lot of positive interaction with each other," in both directions. She explained that M.M. showed E.L. affection during visitations, responded to E.L.'s direction, sought E.L. out in the room, and was "relaxed and happy" around E.L.

---

[9] DHS first presented the testimony of Sally Brunner, a parenting specialist who had provided services to the mother.  Ms. Brunner testified that the mother had informed her that she preferred M.M. to remain with A.P.-1 and A.P.-2.

[10] W. Va. Code § 49-4-601a imposes a duty on DHS to "diligently search for relatives of the child and fictive kin within the first days of a child's removal and must identify and provide notice of the child's need for a placement to relatives and fictive kin who are willing to act as a foster or kinship parent."

4

After hearing from M.M.'s service providers, E.L. called various members of M.M.'s biological family to testify, including M.M.'s maternal grandfather, M.M.'s uncle, and two of E.L.'s cousins. In sum, these witnesses confirmed that DHS failed to contact them about prospective placement of M.M. despite their interest in taking the child. E.L.'s second cousin testified that she informed DHS that "[she] would have taken [M.M.]" and that "there was somebody definitely in the family who would take [M.M.] and that [she] was willing to do that, if that was a possibility," before M.M. was placed with A.P.-1 and A.P.-2, but that DHS did not respond.

The court then heard testimony from both E.L. and foster mother A.P.-1. E.L. explained that although she wasn't present for M.M.'s birth in November 2020,[11] she visited the child for three weeks in December. She testified that at that point, the mother "was clean" and as a result "when [she] left West Virginia to return to San Francisco, [she] felt very hopeful." She further explained that when she next visited West Virginia before removal, the mother was in "good spirits," so she had no "reason to believe that [M.M.] was in danger or that she wasn't being cared for." She testified that after M.M. was removed from the mother and placed with E.N. in August 2021, E.L. stayed in consistent

---

[11] M.M. was born "drug-affected" and was diagnosed with neonatal abstinence syndrome (NAS). It is unclear whether M.M. suffered from NAS due to the mother's use of Subutex or if the mother was using illicit substances at the time of her birth. As a result, M.M. was hospitalized "to treat and better understand the NAS diagnosis."

communication with E.N. about M.M. until M.M. was placed with A.P.-1 and A.P.-2 in September.

E.L. explained that after the mother's death, she immediately contacted the man that she believed was M.M.'s biological father and encouraged him to take a paternity test. She also contacted Mr. Postle to inquire about the case and "get access" to M.M. She also testified that DHS never informed her that she could be a prospective kinship placement for M.M. and that she was not advised about any rights that M.M. had to be with her.

Once the court allowed her to intervene, E.L. told the court that she moved for visitations because she felt alarmed about A.P.-1 and A.P.-2's and DHS's characterization of M.M. as a child with "extreme special needs." She explained that she was, at that point, "quite concerned and wanted to learn more and be able to see [M.M.] and be with [M.M.] to understand." She further explained that once she was permitted to see M.M., the child seemed happy, showed a normal range of emotions, and appropriately responded to limits and redirection. She testified that before placement in foster care, M.M. would develop rashes on the top of her hands, but nothing akin to the severe eczema presented in pictures submitted by A.P.-1 and A.P.-2. She testified that the skin condition was under control when M.M. was under the care of the mother and E.N., and that if the eczema were to continue once M.M. was in her care, she would be equipped with the medical and financial wherewithal to properly care for it.

6

A.P.-1 testified that she is a stay-at-home parent to M.M. and her three other children, and that M.M. considers A.P.-1 and A.P.-2 her "mom" and "dad" and the other children her siblings. She testified that two of her children have severe disabilities, but maintained that she is still able to provide appropriate care to M.M. As for M.M.'s disabilities, A.P.-1 testified that at the time of placement, Birth to Three providers assessed a 40% delay in M.M.'s speech and cognitive skills, and that although those delays have mostly improved, M.M. continues to receive speech, occupational, and developmental therapy twice a month and physical therapy weekly. She also testified that the child's skin issues are so severe that she requires weekly bleach baths, creams, and other care.

A.P.-1 also admitted the purported use of a name for M.M. *other than* her birth name within the foster family and in M.M.'s treatment records. A.P.-1 testified that medical documents listed a separate name for M.M. because she had informed Birth to Three and other providers "that if [A.P.-1 and A.P.-2] ever had the opportunity to adopt [M.M.], [A.P.-1 and A.P.-2] would name [M.M.] that name," but that the providers had never referred to M.M. using that name during appointments.[12] A.P.-1 explained that her other children had referred to M.M. using the separate name by accident because they were

---

[12] Mr. Postle also testified to this practice. He stated that DHS policy precludes foster placements from changing a child's name until after an adoption.

similarly informed about the prospective name change and were "excited at the thought of possibly being able to adopt her as [their] own."[13]

The court also heard testimony from three expert witnesses: Dr. Timothy Saar, Dr. David Clayman, and Josephine Hensley. Dr. Saar testified for the foster parents as an expert in bonding and attachment. He testified that although the child had likely already formed an attachment bond with the mother at the time of removal at nine-months-old, because M.M. had been placed with A.P.-1 and A.P.-2 from the ages of ten-to thirty-months-old, A.P.-1 and A.P.-2 had become M.M.'s primary caregivers. Dr. Saar testified that disruption of M.M.'s primary attachment that she had formed with A.P.-1 and A.P.-2 would be detrimental to her well-being. Dr. Saar opined that such a disruption from her primary attachment could lead to a higher propensity for substance abuse on top of "a higher concern of early pregnancy, of increased depression or anxiety, [and] low academic achievement." Dr. Saar did not dispute that M.M. may have bonded with E.L. during visitation. He also testified that his opinions were based on a review of the scholarly literature, and that he had not observed M.M. interacting with the foster parents or E.L. outside of brief appointments at his office.

---

[13] Karley Rose, the Children First provider testified that when she picked M.M. up from A.P.-1 and A.P.-2's home for visitations with E.L., A.P.-1 and A.P.-2's children referred to her by the same incorrect name listed in the medical paperwork.

Dr. Clayman testified for E.L. as an expert in the evaluation of the appropriate method for conducting bonding and attachment research. He opined that there is no firmly established definition of attachment, and that although the relevant literature indicates that disrupting a child's bond with his or her primary caregiver is unhealthy, it was insufficient for Dr. Saar to base his opinion on a literature review alone, rather than on the M.M.'s actual interactions with the parties. E.L. also offered the testimony of Ms. Hensley, who was qualified as an expert on family reunification. Ms. Hensley testified that she had no concerns about placing M.M. with E.L since, in her opinion, children can bond with anyone and adjust well to changes. She also opined that M.M. was very bonded with E.L. and seemed comfortable in her care.

On August 18, 2023, the circuit court issued its final placement order granting permanent legal and physical custody of M.M. to E.L. The circuit court first recognized that neither of the statutory placement preferences applicable to the adoption of a child under West Virginia Code § 49-4-114(a)(3) apply in this case because E.L. is neither M.M.'s grandparent nor her sibling. The court also observed that DHS may have erred in conducting its due diligence search for kinship placement based on testimony from several witnesses indicating that multiple relatives had informed DHS that they would be willing to take the child, and that there had been a seven-month delay before E.L. could participate in the proceedings because of the ICPC process. Still, the court acknowledged that neither DHS's error nor any bureaucratic delays could be weighed as factors in determining

9

permanent placement, and that its decision must solely be based on the best interest of the child.

The court then made several notable findings. First, the court observed that M.M. could benefit from E.L.'s ability to preserve important relationships with her biological family, particularly in light of the family's desire to provide M.M. with memories of her biological mother. The court then noted that according to the testimony of M.M.'s CASA, various service providers, and even A.P.-1 and A.P.-2's bonding expert, M.M. appears to have a close bond with E.L. The court also observed that although A.P.-1 testified to M.M.'s varying special needs, medical records indicated that M.M. only has eczema and minor developmental delays which had improved with services from Birth to Three. The court also found that even if M.M. were to need additional medical care in the future, E.L. would be equipped to meet those needs because her career is focused on children with special needs. Finally, the court found that E.L. has the capacity to care for M.M. since there are no other children in her home while A.P.-1 and A.P.-2 have three additional children in the home with varying special needs. So, the court concluded that under the totality of the circumstances, permanent placement with E.L. was in M.M.'s best interest. On August 24, 2023, the circuit court held a hearing to address transitioning M.M. from A.P.-1 and A.P.-2's custody to E.L. and ordered that transition to occur gradually over

sixty days.  The day before the transition hearing, A.P.-1 and A.P.-2 noticed an appeal from the circuit court's earlier order granting permanent placement of the child to E.L.[14]

## II. STANDARD OF REVIEW

It is well established that this Court applies a two-prong standard of review to challenges to a circuit court's order:

> "When this Court reviews challenges to the findings and conclusions of the circuit court, a two-prong deferential standard of review is applied. We review the final order and the ultimate disposition under an abuse of discretion standard, and we review the circuit court's underlying factual findings under a clearly erroneous standard." Syl., *McCormick v. Allstate Ins. Co.*, 197 W. Va. 415, 475 S.E.2d 507 (1996).[15]

Regarding the "clearly erroneous standard," we have explained that,

> "A finding is clearly erroneous when, although there is evidence to support the finding, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. However, a reviewing court may not overturn a finding simply because it would have decided the case differently, and it must affirm a finding if the circuit court's account of the evidence is plausible in light of the record viewed in its entirety." Syl. Pt. 1, in part, *In re Tiffany Marie S.*, 196 W. Va. 223, 470 S.E.2d 177 (1996).[16]

---

[14] The foster parents filed an Emergency Motion for a Stay contemporaneous to their notice of appeal.  This Court issued an order refusing that motion on September 14, 2023.

[15] Syl. Pt. 1, *In re S.W.*, 236 W. Va. 309, 779 S.E.2d 577 (2015).

[16] Syl. Pt. 4, *Argus Energy, LLC v. Marenko*, 248 W. Va. 98, 887 S.E.2d 223 (2023) (quoting Syl. Pt. 1, in part, *In re Tiffany Marie S.*, 196 W. Va. 223, 470 S.E.2d 177 (1996)).

So, this Court is not permitted to overturn a circuit court's findings of fact simply because it may have decided the case in a different way. Instead, those findings must be clearly erroneous. The clear error standard of review articulated under our case law requires this Court to affirm factual findings so long as they are plausible upon review of the record as a whole.

Finally, pertinent to our review of the placement order granting permanent custody to E.L., because the trial court is in the best position to evaluate the evidence and testimony before it, this Court's review is highly deferential: "'Questions relating to . . . custody of the children are within the sound discretion of the court [and] its action with respect to such matters will not be disturbed on appeal unless it clearly appears that such discretion has been abused.'"[17]

With this highly deferential standard of review in mind, we now turn to A.P.-1 and A.P.-2's assignments of error.

### III. ANALYSIS

A.P.-1 and A.P.-2 assert that the circuit court's decision to place M.M. with E.L. permanently is erroneous for several reasons. We address each in turn.

---

[17] Syl. Pt. 2, *In re G.G.*, 249 W. Va. 496, 896 S.E.2d 662 (2023) (quoting Syl., in part, *Nichols v. Nichols*, 160 W. Va. 514, 236 S.E.2d 36 (1977)).

*A.      Best Interest Analysis*

In their first assigned error, A.P.-1 and A.P.-2 argue the circuit court's decision to remove M.M. from their home and place her with E.L. finds little to no evidentiary support in the record. They assert that "the lower court's findings were devoid of a best interest analysis, which should have included, among other things, the child's needs and the foster family's ability to meet those needs in comparison to the maternal aunt's ability." E.L. responds that the circuit court made extensive findings of fact to support its placement decision, and that those findings are supported by the record. We agree with E.L.

Before addressing the parties' respective arguments on this point, we review relevant statutes and recent cases. This case involves a custody dispute between M.M.'s foster parents and her maternal aunt. Because M.M.'s mother is deceased and her father is unknown, we begin with the precept that "in a contest involving the custody of an infant where there is no biological parent involved, the best interests of the child are the polar star by which the discretion of the court will be guided."[18] We further note that this Court only recognizes two statutory preferences regarding the adoption of a child: first, a preference

---

[18] Syl. Pt. 9, *In re G.G.*, 249 W. Va. at 496, 896 S.E.2d at 662 (quoting Syl. Pt. 1, in part, *State ex rel. Treadway v. McCoy*, 189 W. Va. 210, 429 S.E.2d 492 (1993)).

for placement with the child's grandparents,[19] and second, a preference for placing a child in the same home as his or her siblings.[20]

In 2020, the Legislature reenacted West Virginia Code § 49-2-126 as the Foster Child Bill of Rights.[21]  Under West Virginia Code § 49-2-126(a)(5), foster children are now afforded "the right to be placed in a kinship placement, when such placement meets the objectives set forth in this article."[22]  We recently discussed that provision as a component of our analysis in *In re G.G.*,[23] a case involving a custody dispute between the child's long-term foster placement and her maternal aunt and uncle.  The maternal aunt and uncle contended that the language providing foster children with "the right to be placed in a kinship placement" in West Virginia Code § 49-2-126(a)(5) created an adoptive placement preference for a child's blood relatives generally.[24]

We rejected that argument, noting that § 49-2-126(a)(5) contains qualifying language that a kinship placement should occur only where "such placement meets the

---

[19] W. Va. Code § 49-4-114(a)(3) (2015).

[20] W. Va. Code § 49-4-111 (2015); *see also* Syl. Pt. 2, *In re K.L. and R.L.*, 241 W. Va. 546, 826 S.E.2d 671 (2019).

[21] *See* W. Va. Code § 49-2-126(a).

[22] W. Va. Code § 49-2-126.

[23] 249 W. Va. 496, 896 S.E.2d 662 (2023).

[24] *Id*. at 501, 896 S.E.2d at 667.

14

objects set forth in this article."[25] We then considered the stated purpose under Chapter 49 of the West Virginia Code: to provide a system of child welfare services that ensures "appropriate care is given and maintained" to children who become part of that system,[26] and concluded that in order to achieve that purpose, courts must consider the best interest of the child.[27] We further concluded that because the Legislature has not indicated a mandatory placement preference for a child's blood relatives generally anywhere else within our code, Section 49-2-126(a)(5) "simply provides a right to a foster child, not an adoptive placement preference for the child's relatives."[28]

In sum, the common thread in this Court's mandate in custody disputes between a long-term foster placement and a child's blood relative is that "West Virginia Code § 49-2-126(a)(5) (2020) requires a circuit court to conduct a best-interest-of-the-child analysis before removing a foster child from his or her foster family home and placing that child in a kinship placement."[29] A circuit court's best interest analysis is then subject to the same deferential standard of review that we apply in all other cases. With that established,

---

[25] *Id*. at 502, 896 S.E.2d at 668.

[26] W. Va. Code § 49-1-105 (2015).

[27] *In re G.G.*, 249 W. Va. at 502, 896 S.E.2d at 668.

[28] *Id.* at 504, 249 S.E.2d at 670.

[29] Syl. Pt. 4, *Id.*

15

we return to A.P.-1 and A.P.-2's arguments related to the circuit court's best interest analysis.

Although A.P.-1 and A.P.-2 maintain that the circuit court's ultimate placement order was devoid of a proper best-interest-of-the-child analysis due to its alleged consideration of various impermissible factors, it is clear that their actual issue with the order is the court's weighing of the underlying evidence. For example, A.P.-1 and A.P.-2 contend that the circuit court impermissibly placed E.L.'s rights above the rights of M.M., in contravention of our holding in *State ex rel. Treadway v. McCoy*.[30]

In *Treadway*, this Court considered a custody dispute between a child's half-sister and the child's long-term foster parents.[31] In that case, the circuit court granted custody of the child to her half-sister, basing much of its decision on the "rights" of the sister rather than the best interest of the child.[32] This Court reversed that decision, noting that the child should have been placed with the half-sister at the outset of the proceedings, but clarifying that the question of who has "better" rights to the child was not relevant to a consideration of the child's best interest.[33] Critically, the child's half-sister had "virtually

---

[30] 189 W. Va. 210, 429 S.E.2d 492 (1993).

[31] *Id*. at 211, 429 S.E.2d at 493.

[32] *Id*.

[33] *Id*. at 212-214, 429 S.E.2d at 494-496.

no contact with [the child] at any time in [the child's] life,"[34] and the child's *most* meaningful, stable relationship was with her foster family.[35] We reiterated that "in a contest involving the custody of an infant where there is no biological parent involved, the best interests of the child are the polar star by which the discretion of the court will be guided,"[36] and explained that "presumptively, if a child is in a loving and caring foster home, the child will be harmed by being removed from that home and placed in a strange, unknown home."[37] So, we concluded that the child's interest in that case was best served by preserving the relationships that the child had formed with the foster family.[38]

We agree with A.P.-1 and A.P.-2 that had the circuit court's order examined E.L.'s "rights" to M.M. as part of its analysis, any resulting placement decision would have been in error. But A.P.-1 and A.P.-2 fail to identify where in its order that the circuit court made any observations with regard to which of the two placements had better "rights" to M.M., and this Court's review of the placement order yields similar results. Instead, this assignment of error seems rooted in *Treadway*'s observation that "presumptively, if a child is in a loving and caring foster home, the child will be harmed by being removed from that

---

[34] *Id*. at 213, 429 S.E.2d at 495.

[35] *Id*. at 214, 429 S.E.2d at 496.

[36] Syl. Pt. 9, *In re G.G.*, 249 W. Va. at 496, 896 S.E.2d at 662 (quoting Syl. Pt. 1, in part, *State ex rel. Treadway v. McCoy*, 189 W. Va. 210, 429 S.E.2d 492 (1993)).

[37] *Treadway*, 189 W. Va. at 213, 429 S.E.2d at 495.

[38] *Id*.

home and placed in a strange, unknown home."[39]  A.P.-1 and A.P.-2 argue that because E.L. had only met M.M. twice in person before the child was removed from the mother's custody and did not begin any consistent visitation with M.M. until a year after the mother's passing, her home in California was a "strange, unknown home," of the type discussed in *Treadway*.  In contrast, A.P.-1 and A.P.-2 assert that incontrovertible evidence before the circuit court showed that their home was "loving and caring."  A.P.-1 and A.P.-2 thus contend that the court's decision to grant custody to E.L. "directly contradict[s] the findings of *Treadway*."

True, the court in *Treadway* reversed the circuit court's removal of the child from her long-term foster placement, but there, unlike here, the relative placement had never had any contact with the child prior to the institution of the proceedings.[40]  More critically, the circuit court in that case failed to complete a proper best-interest-of-the-child analysis at all, because it rested its analysis on bureaucratic errors that had cut away at the "rights" of the prospective relative placement.[41]  By contrast, the circuit court in this case

---

[39] *Id*. (stating that "presumptively, if a child is in a loving and caring foster home, the child will be harmed by being removed from that home and placed in a strange, unknown home").

[40] *Id.* at 214, 429 S.E.2d at 496.

[41] *Id*. at 212, 429 S.E.2d at 494.

made 210 detailed factual findings in its order supporting its decision to place M.M. with E.L.

In spite of A.P.-1 and A.P-2's contention that E.L. was not involved in M.M.'s life until visitations began in October 2022, the court specifically noted E.L.'s involvement throughout the case, a finding that is supported by the record. According to E.L.'s testimony, she first visited M.M. for three weeks and returned to West Virginia to visit M.M. again before DHS filed the petition in August 2021. Outside of these visits, E.L. maintained contact with M.M. through video calls and text message updates even after the child was placed with E.N. And after the death of the mother, E.L. intervened in the proceedings as soon as the court determined that the putative father was not biologically related to M.M. Once the court permitted E.L. to intervene in the proceedings, she relocated from her home in California so she could be closer to M.M. and moved for visitations. By October 2022, E.L. had been granted three-hours-long supervised visitation with the child twice per week, and in November 2022, those visitations increased to four-hours long and three times per week.[42]

---

[42] A.P.-1 and A.P.-2 maintain that E.L. had only ever visited with M.M. for six hours total throughout the entire case. Although it is not clear from the record exactly how much time M.M. spent with E.L., we note that E.L.'s expert cited to over twenty-hours of video footage capturing interactions between E.L. and M.M. when forming her opinion about M.M.'s bond with E.L.

A.P.-1 and A.P.-2 assert that these visits were "always supervised, never overnight, and often canceled," in order to support their contention that placement with E.L. puts M.M. into an unfamiliar and strange environment. But a review of the record shows that E.L. was far from strange and unknown to M.M. at the time of the court's custody determination. The court's order specifically noted the child's relationship with E.L. and discussed testimony from M.M.'s CASA that during visitations, M.M. and E.L. "seemed to have a lot of positive interaction with each other." The CASA further testified that M.M. showed E.L. affection, responded to E.L.'s direction, sought E.L. out in the room, and was "relaxed and happy" around E.L. M.M.'s service provider similarly testified to M.M.'s interactions with E.L. during visitations, explaining that M.M. showed signs of love and affection for E.L. and responded appropriately and positively to her direction.

In contrast to the circumstances in *Treadway*, here, M.M. had loving relationships with both families—a fact that the court observed in the course of conducting its best-interest-of-the-child analysis, as required under Syllabus Point 2 of *Treadway*. Weighing the evidence before it, the court determined that placement with E.L. was in M.M.'s best interest. Because a review of the record in its entirety does not leave this Court with "the definite and firm conviction that a mistake has been committed" in its

determination,[43] we disagree with A.P.-1 and A.P.-2 that the circuit court committed a *Treadway* error by placing the child in a "strange, unknown home."

A.P.-1 and A.P.-2 next contend that the court erred in its placement determination because we have held that "[t]he best interests of a child are served by preserving important relationships in that child's life[,]"[44] and the court's decision to place M.M. with E.L. "effectively eliminates all important relationships and bonds" that M.M. had established with the foster family. They specifically argue that although M.M. had formed close emotional bonds with A.P.-1 and A.P.-2, she had no similar bond with E.L. and that "the lower court found value in the relationship solely because the aunt was a biological relative." So, according to A.P.-1 and A.P.-2, "[w]hile the lower court accurately states in its Final order that there are no statutory familial preferences applicable in this case, it still uses the existence of a blood relative as an important determinative factor in

---

[43] Syl. Pt. 4, *Argus Energy, LLC v. Marenko*, 248 W. Va. at 98, 887 S.E.2d at 223 (quoting Syl. Pt. 1, in part, *In the Interest of Tiffany Marie S.*, 196 W. Va. 223, 470 S.E.2d 177 (2002)).

[44] Syl. Pt. 7, *In re G.G.*, 249 W. Va. at 504, 896 S.E.2d at 670 (quoting Syl. Pt. 2, *State ex rel. Treadway v. McCoy*, 189 W. Va. 210, 429 S.E.2d 492 (1993)). *See also Kristopher O. v. Mazzone*, 227 W. Va. 184, 188, 706 S.E.2d 381, 385 (2011). In *Kristopher O.*, this Court considered a petition for a writ of prohibition filed by the long-term foster parents, seeking to prohibit the circuit court from enforcing an order granting legal and physical custody of the child to the paternal aunt. *Id.* Because the petitioners in that case were not permitted to intervene and were therefore not given the opportunity to present evidence regarding the child's best interest, this Court concluded that the circuit court lacked a sufficient record to support its determination to remove the child. *Id.* at 196, 769 S.E.2d at 393.

its best interest analysis." In other words, although A.P.-1 and A.P.-2 craft this argument as a failure to preserve important relationships issue, what they actually assert is that the circuit court erred in its best interest analysis by erroneously imposing a placement preference for E.L. as M.M.'s blood relative.

We agree with A.P.-1 and A.P.-2 that it is erroneous for a circuit court to use the existence of a blood relative as *the* determinative factor since our holding in *In re G.G.* rejected the premise that West Virginia Code § 49-2-126(a)(5) provides an adoptive placement preference for a child's blood relatives, generally.[45] Instead, "circuit courts are required to conduct a best-interest-of-the-child analysis before removing a foster child from his or her foster family home and placing that child in a kinship placement."[46] But relevant to the circuit court's placement determination in this case, in *G.G.*, we considered this Court's earlier analysis of subsection (a)(6) of that statute—addressing a child's right to be placed with siblings—and determined that the same analysis is equally applicable to the kinship placement subsection. Indeed, when we addressed West Virginia Code § 49-2-126(a)(6) in another custody contest between a child's long-term foster placement and a separate placement with the child's siblings in *In re R.S.*,[47] we explained that § 49-2-126(a)(6) "does not mandate that a child be placed in the same home with his or her

---

[45] *In re G.G.*, 249 W. Va. at 504, 896 S.E.2d at 670.

[46] *Id*. at 496, 896 S.E.2d at 662.

[47] 244 W. Va. 564, 855 S.E.2d 355.

siblings,"[48] the statute instead requires circuit courts to consider the child's "needs" or best interest, "which may include whether the child can be placed with his or her siblings."[49]

In its placement order, the circuit court in this case acknowledged testimony from both DHS and A.P.-1 that M.M. was bonded significantly with A.P.-1 and A.P.-2 and that she got along well with A.P.-1 and A.P.-2's children, their cousins, and their extended family. But the court also heard expert testimony that at the time of removal during the underlying abuse and neglect proceedings, M.M. was already forming attachments to her biological mother. And when evaluating the important relationships in M.M.'s life, the court took account of E.L.'s ability to maintain M.M.'s relationship with her extended biological family and determined that as a result, placement with E.L. would be in M.M.'s best interest. During the permanency hearings, E.L. testified that she frequently travels to see M.M.'s biological family and M.M.'s maternal grandfather likewise testified that he frequently visits with E.L. in California. Both E.L. and the maternal grandfather expressed the close relationship they had with M.M.'s deceased mother and their desire to provide M.M. with her mother's memories. Moreover, E.L. testified that she remains close with M.M.'s half-siblings and would encourage M.M. to have as much contact with her siblings as possible.

---

[48] *Id*. at 572, 855 S.E.2d at 363.

[49] *Id*.

23

In sum, we agree with A.P.-1 and A.P.-2 that it would have been erroneous for the circuit court to impose a placement preference for M.M.'s blood relatives. But consonant with our holding in *R.S.*, the circuit court was still required to consider M.M.'s "needs" and best interest, which may include, as in the instant case, the existence of blood relatives. Here, the circuit court weighed E.L.'s ability to maintain M.M.'s relationships with members of her extended family as one consideration in its analysis. The court particularly noted the family's ties to music performance and their ability to provide M.M. with memories of her mother. But the court considered this evidence as just one in an aggregate of factors that supported its decision to grant permanent placement to E.L. Also supporting its placement determination, the court considered testimony from the CASA and various service providers that M.M. is closely bonded to E.L.; evidence that although A.P.-1 testified to M.M.'s varying special needs, medical records ultimately indicated that M.M. only suffered from eczema and minor developmental delays; and testimony showing that E.L. is well-equipped to meet M.M.'s medical and other needs due to the fact that her career focused on children with special needs and the fact that there are no other children in her home.

Had the circuit court rested its entire best interest determination on the existence of M.M.'s blood relatives, we agree that any resulting placement determination would have been questionable in light of our caselaw and governing statutes. But in this case, we agree with E.L. that the circuit court meticulously applied our holdings from

*Treadway*, *In re G.G.*, and *In re R.S.* that mandated a best-interest-of-the-child analysis in its order granting permanent placement to E.L.

## B. DHS and Guardian's Recommendations

Having found no abuse of discretion in the circuit court's best-interest-of-the-child analysis, we now turn to A.P.-1 and A.P.-2's second assignment of error—their contention that "the circuit court erred in entirely disregarding the report and recommendations of the Guardian ad Litem and [DHS]." A.P.-1 and A.P.-2 concede that the final determination of what is in the best interest of a child in custody proceedings is left to the court but maintain that this Court's precedent indicates that recommendations of a guardian ad litem are not to be entirely disregarded, and that the same holds true for the recommendation of DHS. E.L. asserts that the findings of fact in the placement order referenced the recommendation of DHS and established why it was not adopted by the court. Otherwise, sufficient factual findings existed under the totality of the evidence to support the court's decision to disagree with the recommendations.

We are not persuaded by A.P.-1 and A.P-2's contention that the circuit court must reference the reports of the GAL in its order simply because "voluminous precedent [indicates] that the recommendations of a guardian ad litem are not to be entirely ignored or disregarded, as they often provide crucial insight into the lives of the parties and the child that the lower court would otherwise not be privy [to]," and that this same analysis should be imputed on to the recommendations of the DHS. In *State ex rel. Jeanne U. v.*

25

*Canady*,[50] the Court observed that "[w]hile the guardian ad litem is appointed to protect the interest of the minor child, the ultimate determination regarding the best interest of the child remains a function of the trial court, as assisted by the recommendations of the guardian ad litem and others."[51] Consistent with this observation, we have never imposed a duty on a circuit court to explicitly reference the report of the GAL in its orders and decline to do so today. And we disagree with A.P.-1 and A.P.-2's assertion that because the circuit court made no mention of the GAL's report in its placement order, it necessarily follows that the report was entirely disregarded. Rather, as noted above, the court made numerous findings to support its custody determination.

In its determination that granting custody to E.L. was in M.M.'s best interest, once again, the court considered the testimony of the service providers, the CASA worker, and even A.P.-1 and A.P.-2's own expert—all of whom expressed that M.M. shows affection for and appears bonded to E.L. The court also favorably considered the CASA's recommendation that M.M. be placed with E.L. Finally, the court weighed the totality of the evidence in this case—including that M.M. could benefit from close familial bonds with her biological family, that M.M. appears to have a close bond with E.L., that E.L. is

---

[50] 210 W. Va. 88, 554 S.E.2d 121 (2001).

[51] *Id.* at 98, 554 S.E.2d at 131, n. 8.

26

well-equipped to manage any health concerns that may arise in M.M., and that E.L. has the capacity to care for M.M. since there are no other children in the home.

Although the court's order did not explicitly reference the report of the GAL, the circuit court made several observations with regard to DHS's recommendation that support its decision to set that recommendation to the side. First, Mr. Postle—the DHS worker assigned to the case at the time of the permanency hearings—was not the original worker on the case. More concerning, he testified that he did not consult with the former worker Heather Johnson—who had handled the matter before the death of M.M.'s biological mother—in making his recommendation. And although Mr. Postle recommended placement with A.P.-1 and A.P.-2 based on M.M.'s bonds with the foster family, he testified that he never observed M.M.'s interactions with E. L. and that he was wary from the start that E.L. had played some role in the grandmother's absconding from the state with the child—an allegation that proved to be entirely unsubstantiated.[52]

---

[52] At the December 2022 permanency hearing when asked: "You objected to the intervention because initially you asserted to this Court that somehow [E.L.] had assisted her mother in kidnapping the child," Mr. Postle responded: "That was the Department, yes." When asked again: "You objected to [E.L.'s] intervention because you said she assisted in the kidnapping and that was completely incorrect because you had no evidence of that whatsoever, correct?" Mr. Postle once again responded: "Not any evidence, correct."

This Court recognizes the critical role that guardians ad litem play in proceedings involving minor children.[53]  We also recognize the important role of the DHS in conducting thorough investigations and making recommendations about potential placements.  But we reiterate that "the ultimate determination regarding the best interest of the child remains a function of the trial court."[54]  In this case, the circuit court evaluated the evidence, testimony, and expert testimony to arrive at its decision to grant placement of M.M. to E.L.  Because sufficient factual findings that are plausible on the record as a whole support the court's order, and because it does not appear that the circuit court abused its discretion in its ultimate placement determination, we decline to disturb the court's decision.

## C.      A.P.-1 and A.P.-2's Expert

Finally, we turn to A.P.-1 and A.P.-2's third and last assigned error in this case—that the court erred by disregarding the testimony of their expert, Dr. Saar.[55]  A.P.-1

---

[53] *See Kristopher O.*, 227 W. Va. at 196 n. 4, 706 S.E.2d at 393 n. 4 ("A guardian ad litem has a duty to advocate for the child at every level . . . . This duty includes appearing before this Court to represent the child during oral arguments.  In fact, the guardian ad litem's role to represent the child does not cease until permanent placement of the child is achieved.").

[54] *Canady*, 210 W. Va. at 88 n. 8, 554 S.E.2d at 121, n.8.

[55] A.P.-1 and A.P.-2 cite the recent decision by the Intermediate Court of Appeals of West Virginia (ICA) in *Jonpaul v. Heather C.,* 248 W. Va. 687, 889 S.E.2d 769 (W. Va. Ct. App 2023) to support their contention that the court erred in its consideration of the expert testimony.  In *Jonpaul*, the ICA found clear and reversible error in a family court's decision not to modify a parenting plan in contravention of the recommendation of counselors, therapists, and the GAL.  The ICA specifically noted that "the family court arbitrarily

28

and A.P.-2 argue that the court abused its discretion by ignoring expert testimony that to a "reasonable degree of psychological certainty" there could be future negative consequences to M.M. if she were removed from her foster placement. E.L. maintains that by alluding to the "disregard" that the circuit court held for the testimony of Dr. Saar, A.P.-1 and A.P.-2 inaccurately imply that the court ignored his testimony rather than simply making proper credibility determinations.

Before evaluating this assignment of error, we recap the highly deferential standard of review given to a circuit court's evaluation of evidence in this case: "'Questions relating to . . . custody of the children are within the sound discretion of the court [and] its action with respect to such matters will not be disturbed on appeal unless it clearly appears that such discretion has been abused.'"[56] In its order, the court recognized Dr. Saar's opinion "that removing the minor child from [A.P.-1 and A.P.-2's] care would

---

ignored, and failed to discredit or find uncredible, the expert testimony of the counselors/therapists and the recommendation of the GAL in rendering its decision." *Id.* at 696, 889 S.E.2d at 778. The ICA ruled that "completely ignoring such testimony, and failing to explain any reason to do so, is an abuse of discretion." *Id.*

At the outset, the facts before this Court do not present a *Jonpaul* question. In *Jonpaul* the court order *failed to make a credibility determination* by wholly disregarding the GAL, counselors, and therapists, all of whom were consistent in their opinion that a relationship with the child was contrary to the child's best interest. In this case, the court weighed testimony from both A.P.-1 and A.P.-2's expert and E.L.'s counter-expert in making its credibility determination. The question properly before this Court is whether the circuit court made a proper credibility determination, not, as in *Jonpaul*, where one was not made in the first instance.

[56] Syl. Pt. 2, *In re G.G.*, 249 W. Va. at 496, 896 S.E.2d at 662 (quoting Syl., in part, *Nichols v. Nichols*, 160 W. Va. 514, 236 S.E.2d 36 (1977)).

29

be detrimental to her at her young age" based on his development research, but noted that "Dr. Saar could not quantify the likelihood that any adverse effect may happen to the minor child herein," and that based on Dr. Clayman's testimony "it was incorrect for Dr. Saar to opine that adverse effects will absolutely happen to the minor child in this case."

In other words, the court considered the testimony of both experts and ultimately determined that it was incorrect for A.P.-1 and A.P.-2's expert to extrapolate prospective outcomes for M.M. based only on his attachment research addressing children of a similar age. The court also noted that Dr. Saar had never observed M.M. interact with E.L. or A.P.-1 and A.P.-2 outside of brief interviews in his office to assess the bond that M.M. may have had with either family. In light of the ample testimony from other witnesses that M.M. "shows affection [for] and appears to have a bond with the maternal aunt" in addition to "videos and photos showing a bond between the maternal aunt and the child," the court determined that Dr. Saar's bond evaluation was not determinative regarding permanent placement.

Having reviewed the record, we find no error with the circuit court's assessment of the various expert testimony. Although A.P.-1 and A.P.-2 represent that the circuit court improperly ignored the testimony of their expert witness, the court carefully considered both A.P.-1 and A.P.-2's and E.L.'s expert witnesses in its placement order. Because this credibility determination was in the sound discretion of the trial court, and

30

because we do not find that the court abused its discretion in weighing the expert testimony, we decline to disturb this determination on appeal.

## IV. CONCLUSION

For the reasons set forth above, we affirm the August 18, 2023, order of the Circuit Court of Putnam County.

Affirmed.